**United States District Court**
**District of Massachusetts**

| | |
|---|---|
| _____ ) | |
| AMERICAN FREEDOM DEFENSE ) | |
| INITIATIVE, PAMELA GELLER and ) | |
| ROBERT SPENCER, ) | |
| ) | |
| Plaintiffs, ) | Civil Action No. |
| ) | 13-12803-NMG |
| v. ) | |
| ) | |
| MASSACHUSETTS BAY TRANSPORTATION ) | |
| AUTHORITY and BEVERLY SCOTT, ) | |
| ) | |
| Defendants. ) | |
| _____ ) | |

<u>**MEMORANDUM & ORDER**</u>

**GORTON, J.**

This case involves a First Amendment challenge to the rejection of an advertisement by the Massachusetts Bay Transportation Authority ("MBTA"), an independent authority that provides mass public transit in the Boston metropolitan area.

The dispute arose after the American Freedom Defense Initiative ("AFDI"), a non-profit advocacy organization known for its provocative public transit advertising campaigns, submitted an advertisement ("the AFDI Pro-Israel Advertisement") to the MBTA that read: "In any war between the civilized man and the savage, support the civilized man. Support Israel. Defeat Jihad."  The MBTA rejected the advertisement on the grounds that it would demean and disparage Muslims and/or Palestinians in violation of its advertising program guidelines.

-1-

Plaintiffs now seek an order requiring the MBTA to accept and display their advertisement.  For the reasons that follow, that motion will be denied.

## I.   Background

### A.   The parties

AFDI is an advocacy organization that seeks to educate the public about the purported threats posed by Islam and jihad. AFDI promotes its viewpoint on those issues by, _inter alia_, purchasing advertising space on public transit vehicles and facilities.  Plaintiffs Pamela Geller ("Geller") and Robert Spencer are, respectively, the organization's president and vice president.

Defendant MBTA is an independent authority established under Massachusetts law.  Defendant Beverly Scott ("Scott") is the General Manager of the MBTA.

### B.   The MBTA Advertising Guidelines

The MBTA, through its advertising agent, Titan Outdoor LLC ("Titan"), leases space on its facilities and equipment to commercial advertisers and nonprofits.  Its Advertising Program Guidelines ("the Guidelines") describe five program objectives:

(a)  maximizing revenue generated by advertising;

(b)  maximizing revenue generated by attracting, maintaining and increasing ridership;

(c)  maintaining safe and orderly operation;

(d)  maintaining a safe and welcoming environment for all
         MBTA passengers; and

    (e)  avoiding the identification of the MBTA or the
         Commonwealth with ads or advertisers' viewpoints.

The Guidelines state that the MBTA will not accept

advertisements that, among other things, demean or disparage an

individual or group, promote the use of alcohol or tobacco

products, include a depiction of graphic violence, contain

profanities or obscene material or promote unlawful conduct.

They also prohibit political campaign speech and any false,

misleading or deceptive commercial speech.  They do not,

however, prohibit political speech unrelated to a political

campaign, religious messages or speech that expresses

controversial views.

    The Guidelines include a procedure for reviewing

advertisements that might contain unacceptable content.  If the

initial reviewer at Titan believes that an advertisement does

not comply with the Guidelines, he or she refers it to the MBTA

contract administrator.  If the contract administrator agrees

that the advertisement is unacceptable, he or she documents the

reason the advertisement should be rejected and refers it to

MBTA general counsel.  If he or she also agrees, the

advertisement is referred to the MBTA general manager for a

final determination.

The MBTA's current contract administrator, Barbara Moulton, asserts that the MBTA has rejected 13 ads since 2004.  Most of those rejections were due to "prurient sexually suggestive" content or the use of profanities.  The MBTA also found at least one advertisement "demeaning or disparaging" during that period.

The Guidelines provide a process for rehabilitating non-compliant advertisements.  Specifically, once the MBTA determines that an advertisement is unacceptable, Titan

> may...discuss with the advertiser one or more revisions to the advertisement which, if undertaken, would bring the advertisement into conformity with the MBTA's Advertising Guidelines.  The advertiser shall then have the option of submitting a revised advertisement for review by the MBTA.

If the advertiser does not agree to a mutually acceptable revision, it may request a final written notice of the MBTA's decision.

### C.   The subject advertisements

#### 1.   The Palestinian Refugee Advertisement

In October, 2013, the MBTA accepted an advertisement ("the Palestinian Refugee Advertisement") that depicts four maps of the Near East that purport to show how Palestinian territory was chronologically reduced within Israeli-controlled territory between 1946 and 2010.  The maps are accompanied by the following statement: "4.7 million Palestinians are classified by the U.N. as refugees".  That advertisement appeared on 80

posters throughout the MBTA system.  The campaign was funded by a group called the Committee for Peace in Israel and Palestine which has sponsored similar transit system campaigns in New York City and Washington, D.C.

Titan employees were initially unsure if the Palestinian Refugee Advertisement complied with the Guidelines so they submitted it to the MBTA for further review but the MBTA eventually determined that it did comply.  The record before the Court does not explain Titan's concerns or whether the MBTA reviewed the advertisement for compliance with any particular provision of the Guidelines.  Nor does it reveal how many people at the MBTA reviewed the advertisement before it was deemed acceptable.

The Palestinian Refugee Advertisement was removed from MBTA advertising spaces at one point but then reposted after a short hiatus.  It appears that Titan took the posters down after receiving complaints from the public and the Anti-Defamation League about their content.  The MBTA did not offer a clear public explanation for why the posters had been temporarily removed and reported only that there was a "miscommunication" between the MBTA and Titan.

### 2.   The AFDI Pro-Israel Advertisement

On the day after the MBTA announced that it would re-post the Palestinian Refugee Advertisement, plaintiff Geller

contacted Scott Goldsmith ("Goldsmith"), the executive vice president and chief commercial officer of Titan, and requested it to run the AFDI Pro-Israel Advertisement in ten of the Boston MBTA stations where the Palestinian Refugee Advertisement had been posted. The proposed advertisement included the slogan "In any war between the civilized man and the savage, support the civilized man", which was adapted from (but not attributed to) a 1974 speech by the author Ayn Rand, followed by the message "Support Israel. Defeat Jihad."

The MBTA followed the multi-tiered review process described above and Scott ultimately determined that the advertisement was "disparaging or demeaning" under the MBTA Guidelines. The rule against demeaning or disparaging advertisements is more particularly described as follows:

> Demeaning or disparaging. The advertisement contains material that demeans or disparages an individual or group of individuals. For the purposes of determining whether an advertisement contains such material, the MBTA will determine whether a reasonably prudent person, knowledgeable of the MBTA's ridership and using prevailing community standards, would believe that the advertisement contains material that ridicules or mocks, is abusive or hostile to, or debases the dignity and stature of, an individual or group of individuals.

Defendant Scott avers that she rejected the AFDI Pro-Israel Advertisement because she believed that it demeans or disparages Muslims and/or Palestinians and not because she disagrees with the ideology or perspective expressed by the advertisement.

On November 4, 2013, Goldsmith emailed Geller to tell her that the MBTA had rejected the AFDI Pro-Israel Advertisement. The body of the email states:

> The MBTA has rejected your ad because it falls within the category (b)(i) "Demeaning or disparaging". I have attached the ad policy for your review. Thank you.

There is no evidence in the record that defendants described to anyone how the advertisement violated that standard or offered plaintiffs an opportunity to bring their advertisement into compliance.

### 3. "Pro-Israel" advertisements accepted by the MBTA

The MBTA did, however, accept four advertisements that express a "pro-Israel" message that were submitted by an organization called Stand With Us on November 8, 2013. One states that "Jews are Indigenous to Israel" and depicts a series of maps that indicate that Israel is geographically smaller than the "ancient Jewish Kingdom" or the "internationally recognized Jewish homeland" as of 1920. Another allows viewers to link to a website that lists "The Top 10 Things Palestinian Leaders Don't Want You to Know" and states, inter alia, that Palestinian leaders regularly promote hatred, incitement and terrorism against Israel and the Jewish people.

### D. Procedural history

Plaintiffs filed the instant lawsuit on November 6, 2013, two days after Goldsmith informed Geller that the AFDI Pro-

Israel Advertisement was unacceptable.  They filed an amended
complaint two days later and shortly thereafter moved for a
temporary restraining order or preliminary injunction.  The
Court held a hearing on December 4, 2013, and requested
additional briefing on the question of whether the MBTA had
applied its Guidelines correctly to plaintiffs' advertisement.
It received memoranda from both sides on December 6, 2013.

## II.  Plaintiff's Motion for a TRO/Preliminary Injunction

Plaintiffs seek an order that would require the defendants
immediately to display the AFDI Pro-Israel Advertisement.  For
the reasons that follow, plaintiffs' motion will be denied.

### A.  Legal Standard

In order to obtain a preliminary injunction, the moving
party must establish

> that [it] is likely to succeed on the merits, that
> [it] is likely to suffer irreparable harm in the
> absence of preliminary relief, that the balance of
> equities tips in [its] favor, and that an injunction
> is in the public interest.

Voices of the Arab World, Inc. v. MDTV Med. News Now, Inc., 645
F.3d 26, 32 (1st Cir. 2011) (quoting Winter v. Natural Res. Def.
Council, Inc., 555 U.S. 7, 129 (2008)).

In the First Amendment context, "the likelihood of success
on the merits is the linchpin of the preliminary injunction
analysis." Sindicato Puertorriqueño de Trabajadores v. Fortuño,
699 F.3d 1, 10 (1st Cir. 2012).  The likelihood of success is

crucial because irreparable harm is presumed if the court finds
it likely that the moving party's First Amendment rights were
violated. Id. at 10-11 (explaining that the "loss of First
Amendment freedoms, for even minimal periods of time,
unquestionably constitutes irreparable injury" (quoting Elrod v.
Burns, 427 U.S. 327, 373 (1976)).

The same four-factor test applies to motions for temporary
restraining orders. See Largess v. Supreme Judicial Court, 317
F. Supp. 2d 77, 81 (D. Mass. 2004). In this case, however, the
plaintiffs ask for relief in the form of a temporary restraining
order "and/or" preliminary injunction and do not distinguish
between the two different kinds of relief. They did not seek
interim relief prior to the hearing or to the issuance of this
order. The Court will therefore treat their motion as a motion
for a preliminary injunction and rule that their request for a
temporary restraining order is moot.

###    B.    Application

####         1.    Likelihood of Success

Plaintiffs' complaint alleges that defendants violated
their constitutional rights in three ways. First, they assert
that defendants deprived them of their right to engage in
protected speech in a public forum in violation of the First
Amendment. They allege that the disparaging and demeaning
standard discriminates on the basis of content and viewpoint and

-9-

is therefore invalid both on its face and as applied to their advertisement. They also allege that the standard operates as a prior restraint on plaintiffs' speech because it grants a public official unbridled discretion and permits her to apply ambiguous and subjective reasoning. Second, they claim that such restrictions on their speech violate the Equal Protection Clause.[1] Third, plaintiffs claim that the disparaging and demeaning standard violates due process because it is void for vagueness.

Defendants argue that all of those claims are foreclosed by Ridley v. Mass. Bay Transp. Auth., 390 F.3d 65 (1st Cir. 2004). Ridley consolidated two separate challenges to the Guidelines that were filed after the MBTA rejected certain advertisements. The First Circuit upheld the MBTA's decision to reject a religious advertisement that called specific religions "false" but found that the MBTA violated the First Amendment in rejecting advertisements that criticized certain drug laws.

The Court agrees that Ridley controls several of the legal questions in this case. First, the Court is bound by Ridley's holding that the MBTA advertising program is a non-public forum

---

[1] Plaintiffs' First Amendment and Equal Protection claims rely on the same arguments. The Court, therefore, will address them jointly under the framework for reviewing First Amendment claims. See Hill v. Kemp, 645 F. Supp. 2d 992, 1007 (N.D. Okla. 2009) ("When a First Amendment and equal protection claim are intertwined, the First Amendment provides the proper framework for review....").

such that restrictions on speech need only be reasonable and viewpoint neutral. Id. at 76. Plaintiffs contend that forum analysis is not "static" and that this Court is therefore free to revisit the forum issue. The Court declines to do so, however, because it finds no evidence that the nature of the forum has changed since Ridley was decided.

Similarly, the Court is bound by Ridley's holding that 1) the demeaning and disparaging standard is viewpoint neutral on its face, id. at 90-91, 2) the same guideline is facially reasonable in light of the purposes of the forum, id. at 93, and 3) the demeaning and disparaging guideline is not void for vagueness, id. at 95-96.

Ridley does not, however, control the Court's determination of whether it was reasonable for the defendants to conclude that the AFDI Pro-Israel Advertisement demeaned and disparaged Muslims or Palestinians or whether defendants rejected plaintiffs' advertisement because they disagreed with the viewpoint expressed therein. The Court will therefore consider each of those questions seriatim.

### a. Reasonableness

In order to pass constitutional muster, a restriction on speech in a non-public forum must be reasonable. Ridley, 390 F.3d at 90 (citing Cornelius v. NAACP Legal Def. & Educ. Fund, Inc., 473 U.S. 788, 806, 808 (1985)). The First Circuit has

already decided that the demeaning and disparaging guideline is facially neutral so the Court's inquiry is limited to whether the defendants applied that guideline in a reasonable manner.

In Ridley, the First Circuit explained that the reasonableness requirement is easily satisfied:

> The reasonableness standard is not a particularly high hurdle; there can be more than one reasonable decision, and an action need not be the most reasonable decision in order to be reasonable.

Id. (internal citations omitted). It found that it was reasonable for the MBTA to enact a guideline prohibiting demeaning and disparaging advertisements in light of its goals of maintaining ridership levels and providing a safe and welcoming environment. Id. at 93. It did not, however, reach the issue of whether it was reasonable to conclude that the religious advertisement in question was demeaning and disparaging. In contrast, the Ridley court determined that it was unreasonable for the MBTA to conclude that advertisements that criticize the drug laws would promote drug use by minors and to reject them on that basis. Id. at 90.

Despite the fact that the First Circuit did not consider whether the demeaning or disparaging guideline was unreasonably applied in Ridley, the Court finds that it is proper to do so in this case. Ridley acknowledged that deciding whether an advertisement is demeaning or disparaging involves "some degree

of interpretation." Id. at 95.  The fact that the standard

requires the MBTA to exercise some discretion does not mean that

the Court is required to accept whatever decision it reaches.

Instead, the Court must examine the MBTA's basis for rejecting

the AFDI Pro-Israel Advertisement to determine if its

conclusions were reasonable.  See, e.g., Am. Freedom Def.

Initiative v. Suburban Mobility Auth. Reg'l Transp., 698 F.3d

885, 892-95 (6th Cir. 2012) (finding that it was reasonable to

ban political advertisements in public transit facilities in

general and also reasonable for the transit authority to

conclude that an advertisement referring to the Muslim concept

of a "fatwa" was a political advertisement).

Plaintiffs contend that it was unreasonable to conclude

that their advertisement demeans or disparages Muslims or

Palestinians.  They argue that their use of the terms "war" and

"jihad" clarify that their message is aimed at people who engage

in terrorist acts that target innocent Israeli citizens and not

Muslims or Palestinians in general.  They argue that the plain

meaning and common understanding of those terms supports their

reading and renders the MBTA's interpretation unreasonable.

Defendants respond that the MBTA acted reasonably in

concluding, as a result of its review process, that the

"reasonably prudent person" would believe that the advertisement

demeans and disparages Muslims or Palestinians.  It points to

the fact that the two district courts in other circuits that have already reviewed the identical AFDI Pro-Israel Advertisement both concluded that the advertisement equates Muslims with "savages". See Am. Freedom Def. Initiative v. Metro. Transp. Auth., 880 F. Supp. 2d 456, 467-69 (S.D.N.Y. 2012) (determining, based on various definitions of "savage" and "jihad" and a review of plaintiff Geller's contemporaneous postings to her website, that the Metropolitan Transportation Authority reasonably read the subject advertisement to "target as savages persons who adhere to Islam"); Am. Freedom Def. Initiative v. Wash. Metro. Area Transit Auth., 898 F. Supp. 2d 73, 79 (D.D.C. 2012) (finding that the advertisement "equates all Muslims with savages").

The Court finds that the meaning of the AFDI Pro-Israel Advertisement is not as clear as plaintiffs assert. In fact, the advertisement is ambiguous in several respects. For instance, "war" could refer, as plaintiffs claim, to the violent acts committed against innocent Israeli citizens. But the term might also refer to the periodic conflicts between Israel and its majority-Muslim neighbors in Egypt, the Gaza Strip, the West Bank and Lebanon. Finally, the term could refer to the metaphysical or ideological struggle between Islam and the West.

Similarly, "jihad" is susceptible to several interpretations. Plaintiffs are correct that it is commonly

interpreted (by this judicial officer among others) as referring to the acts of radical Islamic terrorists.  Jihad is also understood by many, however, to have a more nuanced meaning that emphasizes a duty of introspection and self-improvement over violence applicable to all Muslims.  Dictionary definitions of the term do not resolve the ambiguity. See Oxford English Dictionary (2d ed. 2012) ("A religious war of Muslims against unbelievers in Islam, inculcated as a duty by the Koran and traditions"; "a war or crusade for or against some doctrine, opinion or principle; "war to the death"); Webster's Third New International Dictionary (2002) ("a holy war waged on behalf of Islam as a religious duty"; "a bitter strife or crusade undertaken in the spirit of a holy war"); Webster's II New College Dictionary (3d ed. 2005) ("a Muslim holy war or spiritual struggle against infidels"; "a crusade"; "a struggle").

Nevertheless, the Court agrees with the plaintiffs that the most reasonable interpretation of their advertisement is that they oppose acts of Islamic terrorism directed at Israel.  Thus, if the question before this Court were whether the MBTA adopted the best interpretation of an ambiguous advertisement, it would side with the plaintiffs.  But restrictions on speech in a non-public forum need only be reasonable and need not be the most reasonable. See Ridley, 390 F.3d at 90.  In this case, the Court

understands the inquiry to require only that the MBTA reasonably interpret the ambivalent advertisement.  In light of the several divergent interpretations, it was plausible for the defendants to conclude that the AFDI Pro-Israel Advertisement demeans or disparages Muslims or Palestinians.

Moreover, the Court declines to adopt the standard for reasonableness urged by plaintiffs.  They contend that, in this case, it was per se unreasonable to reject the AFDI Pro-Israel Advertisement because it might cause customers to complain but accept the Palestinian Refugee Advertisement which actually provoked complaints.  In effect, plaintiffs urge the Court to rule that once the MBTA decides to restrict some speech in light of its ultimate objectives of maintaining ridership levels and creating a welcoming environment, it must restrict all speech that could frustrate those objectives.

Such precision is unnecessary in a non-public forum.  For instance, the First Circuit recently held that the Postal Service could reasonably ban political campaigning on its sidewalks for the purpose of avoiding the appearance of political entanglement despite the fact that it allowed people to advocate for "even the most controversial [ballot] initiatives" on the same sidewalks. DelGallo v. Parent, 557 F.3d 58, 74 (1st Cir. 2009).  The court reasoned that holding otherwise would "turn[] the law of non-public fora on its head"

by creating an incentive for the Postal Service to exclude all speech from the forum. Id. at 75. Moreover, it concluded that the Postal Service had at least a plausible basis for distinguishing between candidates and ballot initiatives, finding that the latter did not raise the same concerns about favoritism or patronage. Id.

In short, the MBTA is not required to treat all advertisements that might offend riders the same so long as there are plausible reasons for any distinction. The First Circuit Court of Appeals has held that it is reasonable to exclude demeaning or disparaging content in light of the purposes of the MBTA's advertising program. The fact that excluding certain controversial content would also serve those purposes is irrelevant to the Court's as-applied analysis and, in any event, the MBTA's Guidelines do not permit it to reject an advertisement solely because it is controversial.

### b. Viewpoint neutrality

Plaintiffs also contend that the defendants rejected their advertisement because they oppose plaintiffs' message and therefore unconstitutionally discriminated on the basis of viewpoint.

The "essence" of viewpoint discrimination is that the government

> inten[ds] to intervene in a way that prefers one
> particular viewpoint in speech over other perspectives
> on the same topic.

Ridley, 390 F.3d at 82. As an initial matter, the Court

disagrees with plaintiffs that it must find viewpoint

discrimination merely because defendants accepted an

advertisement with a pro-Palestinian message. That contention

is belied by the fact that defendants accepted the pro-Israel

advertisements submitted by Stand With Us shortly after

rejecting plaintiffs' advertisement.

Of course, the lack of blatant viewpoint discrimination in

the record does not negate the Court's inquiry. Even if the

MBTA did not intend to suppress pro-Israel messages in general,

it could still impermissibly discriminate against plaintiffs'

particular view that jihadist terrorists who target Israel are

savages. Plaintiffs advance two arguments for why that is the

case.

First, plaintiffs claim that they cannot effectively convey

their outrage at the brutal acts committed against innocent

Israeli citizens without using the term "savage" and that the

defendants, who presumably object to their use of that term,

have therefore unconstitutionally suppressed plaintiffs' view

that jihadist terrorists are savages.

That argument finds some support in Ridley, which held that

the government may not "intentionally tilt[] the playing field

for speech" because reducing a message's effectiveness is also a form of viewpoint discrimination. Id. at 88. Thus, in Ridley, the First Circuit found that the MBTA violated an advertiser's First Amendment rights because it was only willing to run advertisements criticizing the drug laws if they were accompanied by large disclaimers stating that drug use is illegal. The court found that the disclaimers would render the advertiser's message ineffective and therefore be equivalent to suppressing the message altogether.

Yet Plaintiffs' argument, while intriguing, is likely foreclosed by Ridley's discussion of the demeaning or disparaging standard. Specifically, the First Circuit reasoned that the MBTA may set reasonable ground rules that do not attempt to give one group an advantage over any other in the "marketplace for speech":

> We reject the argument that because a government commercial enterprise has opened up discussion on one particular "topic" (say, religion), it must allow any and all discussion on that topic. Reasonable ground rules, so long as they are not intended to give one side an advantage or another, can be set without falling prey to viewpoint discrimination.

Id. at 91-92.

Plaintiffs have not provided a satisfactory answer to the question posed by this Court at the hearing: Is the MBTA required to accept speech that violates those "reasonable ground rules" when applying those rules would render the message less

-19-

effective?  Ridley did not directly answer that question either but the opinion suggests that excluding demeaning or disparaging speech does not tilt the playing field because the requirement to be civil applies to every speaker equally.  See id. at 91. Thus, the Court finds that plaintiffs do not have the right to use whatever terms they wish to use in a non-public forum simply because they are the most effective means of expressing their message.

Plaintiffs also urge the Court to find viewpoint discrimination based on the fact that defendants accepted an advertisement (the Palestinian Refugee Advertisement) that plaintiffs believe demeans and disparages Israelis and Jews. This view also finds support in Ridley, which explained that

> where the government states that it rejects something because of a certain characteristic, but other things possessing the same characteristic are accepted, this sort of under-inclusiveness raises a suspicion that the stated neutral ground for an action is meant to shield an impermissible motive.

Id.  In an earlier case, the First Circuit found that the MBTA discriminated on the basis of viewpoint when it rejected an advertisement that promoted condom use on the basis that it was sexually explicit but accepted without comment advertisements for the movie Fatal Instinct that were at least as sexually explicit.  AIDS Action Comm. of Mass., Inc. v. Mass. Bay Transp. Auth., 42 F.3d 1, 10 (1st Cir. 1994).  The court explained that

even though the MBTA purported to be applying its viewpoint-neutral guideline banning sexually explicit content, it had failed to dispel the appearance that it actually disagreed with the viewpoint expressed by the condom advertisement. Id. at 11.

Plaintiffs contend for a similar result here. They assert that the Palestinian Refugee Advertisement demeans Israelis because it expresses the "unmistakable" message that Israelis are war criminals or, at the very least, violate international law. They also believe that the fact that the MBTA received complaints about the advertisement is evidence that it is demeaning or disparaging. Defendants respond that the Palestinian Refugee Advertisement is fundamentally different from the AFDI Pro-Israel Advertisement because it does not ridicule, mock or debase any group.

Plaintiffs are correct that the two advertisements have something in common: both take controversial stances on the Israeli-Palestinian conflict and both are likely to offend some riders of the MBTA. Those facts alone, however, do not command the same result as that reached in the AIDS Action Committee case. In order to prevail on their theory, plaintiffs must show that the Palestinian Refugee Advertisement is at least as disparaging or demeaning as the AFDI Pro-Israel Advertisement. The Court is not convinced that is the case.

While the Palestinian Refugee Advertisement surely conveys information that portrays Israel in a negative light, it does not do so in a way that violates the demeaning and disparaging guideline.  A reasonable person may disagree with or dislike the message of an advertisement without finding it demeaning or disparaging.  Thus, the question is not whether the advertisement upset some transit riders but instead whether a reasonably prudent person would find that it "ridicules or mocks, is abusive or hostile to, or debases the dignity and stature of" Israelis or Jews.  The Court finds that the advertisement is hostile to Israel's policies toward Palestinians, particularly Palestinian refugees but does not debase the dignity of Israelis or Jews as human beings.

In contrast, labeling a member of a group "a savage", as defendants not unreasonably believe is done by plaintiffs' advertisement, directly debases that person's dignity.  The quote plaintiffs selected to express their message does not criticize "savage" acts but instead contrasts the state of Israel with the "savages" who oppose or fight against it.  When used as a noun and in contrast with "the civilized man", "savage" is best understood to refer to an uncivilized or barbaric person and not merely someone who is brutal, cruel or fierce. See Oxford English Dictionary (2d ed. 2012) ("a person living in the lowest state of development or cultivation"; "an

uncivilized, wild person"; "a cruel or fierce person");
Webster's Third New International Dictionary (2002) ("a person
living in a primitive state or belonging to a primitive
society"; "one who acts with cruelty"; "a brutal or inhumane
person"; "a completely undisciplined or unmannerly person");
Webster's II New College Dictionary (3d ed. 2005) ("a barbaric
or uncivilized person; "a fierce or vicious person"; "a crude
person").

In so holding, the Court does not discount the fact that
the Palestinian Refugee Advertisement deeply offends plaintiffs
and might offend other members of the community.  The Israeli-
Palestinian conflict is a particularly sensitive topic that is
likely to arouse strong feelings on both sides of the debate.
The MBTA, in deciding to open its advertising program to speech
on controversial topics, has taken on the difficult task of
determining whether speech on that topic crosses the line from
being offensive or hurtful to being demeaning or disparaging
such that it can be excluded from the forum.  This case presents
a close call but the Court concludes that defendants did not
discriminate on the basis of viewpoint in excluding plaintiffs'
advertisement.

At the end of the day, the Court is bound by the fact that
restrictions on speech in a non-public forum need only be
reasonable and viewpoint-neutral.  Because the AFDI Pro-Israel

Advertisement is susceptible to innuendo, the Court cannot say that defendants acted unreasonably in adopting the interpretation that they did.  Furthermore, there is insufficient evidence in the record at this stage of the litigation to prove that the defendants rejected plaintiffs' advertisement because they disagreed with its message.

### 2.  Remaining factors

Because success on the merits is the <u>sine</u> <u>qua</u> <u>non</u> of the preliminary injunction analysis in the First Amendment context, a discussion of the other factors is unnecessary. <u>See</u> <u>Sindicato</u> <u>Puertorriqueño de Trabajadores</u>, 699 F.3d at 10-11.


### ORDER

For those reasons, plaintiffs' motion for a preliminary injunction (Docket No. 16) is **DENIED** and plaintiffs' motion for a temporary restraining order (Docket No. 16) is **DENIED AS MOOT.** **So ordered.**

/s/ Nathaniel M. Gorton
Nathaniel M. Gorton
United States District Judge

Dated December 20, 2013